UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CRAIG CHAQUICO,

Plaintiff,

v.

DAVID FREIBERG, et al.,

Defendants.

Case No. 17-cv-02423-MEJ

**ORDER RE: MOTION TO DISMISS**

Re: Dkt. No. 14

## INTRODUCTION

Defendants David Freiberg, Donny Baldwin, Chris Smith, Jude Gold, and Catherine Richardson (collectively, "Defendants") move to dismiss Plaintiff Craig Chaquico's First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). Mot., Dkt. No. 14; *see* FAC, Dkt. No. 11. Plaintiff filed an Opposition (Dkt. No. 17) and Defendants filed a Reply (Dkt. No. 18). The Court previously found this matter suitable for disposition without oral argument. Dkt. No. 19. Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS IN PART** Defendants' Motion for the following reasons.

## BACKGROUND

In 1970, Plaintiff and nonparty Paul Kantner began recording music and performing concerts with other musicians under the name "Jefferson Starship." FAC ¶ 14. The original lineup of Jefferson Starship included Chaquico, Kantner, Freiberg, and four other band members. *Id.* ¶ 15. From its formation through 1985, Jefferson Starship released twenty platinum and gold albums and reached the top of Billboard charts for multiple releases. *Id.* ¶ 16. Jefferson Starship's members changed on several occasions; Chaquico was the sole member to participate in every

1     album, recording, music video, and tour throughout the band's existence. *Id.*

2          Kantner left the band in 1984. *Id.* ¶ 17. At that time, Kantner initiated a legal action to

3     prevent the remaining band members from using the name Jefferson Starship. *Id.* In 1985,

4     Kantner entered into a settlement agreement (the "1985 Agreement") with the remaining

5     members, including Chaquico, Freiberg, and Baldwin. *Id.* As is relevant here, paragraph 4 of the

6     1985 Agreement provides that

7
8
9
10
> with respect to the trade name "Jefferson Starship", (hereinafter referred to as "The Name"), it is agreed between us that The Name shall be retired effective immediately, with no individual or group, whether or not a party hereto, to be permitted to use The Name, or any designation substantially similar to The Name, in any way, including without limitation, in connection with records, concerts and merchandising. . ."

11     *Id.* ¶ 18 (edits in original). The 1985 Agreement further provides Kantner would no longer be a

12     member of the band, and the remaining members would continue performing under the name

13     "Starship." *Id.*

14          Thereafter, Starship continued on to release hit albums and singles, starting with its first

15     album in 1985, Knee Deep in the Hoopla. *Id.* ¶ 19. Freiberg was subsequently fired from

16     Starship. *Id.* Baldwin was dismissed in 1989, and Plaintiff left the band in 1990. *Id.* ¶ 20.

17          After Plaintiff left Starship, Kantner began performing with numerous musicians under the

18     name "Jefferson Starship," despite the 1985 Agreement's prohibiting such use. *Id.* ¶ 21. Plaintiff

19     pursued legal action against Kantner for Kantner's unauthorized use of the Jefferson Starship

20     name, which resulted in a 1993 settlement agreement (the "1993 Agreement") between Plaintiff

21     and Kantner. *Id.*; *see* Chaquico Decl., Ex. A (1993 Agreement), Dkt. No. 22.

22          Under the 1993 Agreement, Plaintiff gave Kantner permission to use the name "Jefferson

23     Starship" in connection with live performances and the sale of merchandise. FAC ¶ 21; *see* 1993

24     Agreement ¶ 1. Some of the other signatories to the 1985 Agreement also gave such permission to

25     Kantner; no signatories to the 1985 Agreement objected to Kantner's use of the Jefferson Starship

26     name. FAC ¶ 21.

27          Freiberg and Baldwin joined Kantner's Jefferson Starship lineup in 2005 and 2008,

28     respectively. *Id.* ¶ 22. The group continued to perform under the name Jefferson Starship. *Id.*

United States District Court
Northern District of California

2

1      Kantner died in January 2016.  *Id.* ¶ 23.  This terminated the 1993 Agreement and

2  Plaintiff's permission thereunder to use the Jefferson Starship name.  *Id.*  Defendants nevertheless

3  continue to perform and sell merchandise using the Jefferson Starship name, in direct violation of

4  the 1985 Agreement and despite Plaintiff's repeated demands to cease and desist doing so.  *Id.* ¶

5  24.

6      Plaintiff objects to the continued use of the Jefferson Starship name as the current band's

7  connection to the original band is too attenuated to preserve the rich legacy of the band's music:

8  the current iteration of Jefferson Starship only features two members of the original band, Freiberg

9  and Baldwin, and of those two, only Freiberg is a founding member.  *Id.* ¶ 24.  That Freiberg and

10  Baldwin were "ignominiously dismissed" from Starship in the 1980s is a further affront to the

11  Jefferson Starship legacy.  *Id.*

12      Defendants also use images of the original Jefferson Starship lineup—including of

13  Plaintiff—to sell merchandise and promote the band, without Plaintiff's permission.  *Id.* ¶ 25.

14  This has turned Plaintiff into an involuntary spokesperson for the band, and has created confusion

15  and the false impression amongst consumers that Plaintiff sponsors, endorses, or is otherwise

16  associated with the band.  *Id.*  Defendants refuse to cease their unauthorized use of the Jefferson

17  Starship name and claim they have permission from the other living signatories to the 1985

18  Agreement to use the name.  *Id.* ¶ 26.  Defendants also continue to use Plaintiff's image to

19  advertise and promote ticket sales.  *Id.*[1]

20      Plaintiff initiated this lawsuit on April 27, 2017.  *See* Compl., Dkt. No. 1.  He filed the

21  operative FAC on June 23, 2017.  *See* FAC.  In his FAC, Plaintiff asserts two claims: (1) breach of

22  contract against Freiberg and Baldwin, and (2) violation of the Lanham Act, 15 U.S.C. 1125(a),

23  against all Defendants.  *Id.* ¶¶ 27-39.  Plaintiff seeks an injunction prohibiting Freiberg and

24  Baldwin's continued use of the Jefferson Starship name and prohibiting all Defendants from using

25

26  _____

[1] Although Plaintiff generally alleges "Defendants have continued to perform and sell merchandise
using the Jefferson Starship name without Chaquico's permission to do so" (FAC ¶ 23; *see also id.*
27  ¶¶ 24-26, 34-35), the FAC does not contain any allegations as to how Smith, Gold, and
Richardson are associated with Jefferson Starship or how they use its name.  The only facts
28  specific to these Defendants concern their places of residency.  *Id.* ¶¶ 8-10.

United States District Court
Northern District of California

1   Plaintiff's likeness in connection with advertising and ticket sales.  *Id.* at 9-10.  Defendants now

2   move to dismiss the FAC in its entirety.  *See* Mot.

3                                        **LEGAL STANDARD**

4           Rule 8(a) requires that a complaint contain a "short and plain statement of the claim

5   showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint must therefore

6   provide a defendant with "fair notice" of the claims against it and the grounds for relief.  *Bell Atl.*

7   *Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted).

8           A court may dismiss a complaint under Rule 12(b)(6) when it does not contain enough

9   facts to state a claim to relief that is plausible on its face.  *Id.* at 570.  "A claim has facial

10  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

11  inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662,

12  678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for

13  more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550

14  U.S. at 557).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

15  detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to

16  relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

17  cause of action will not do.  Factual allegations must be enough to raise a right to relief above the

18  speculative level."  *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted).

19          In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as

20  true and construe them in the light most favorable to the plaintiff.  *Id.* at 550; *Erickson v. Pardus*,

21  551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007).  In

22  addition, courts may consider documents attached to the complaint.  *Parks Sch. of Bus., Inc. v.*

23  *Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted).

24          If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no

25  request to amend the pleading was made, unless it determines that the pleading could not possibly

26  be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en

27  banc) (internal quotations and citations omitted).  However, the Court may deny leave to amend

28  for a number of reasons, including "undue delay, bad faith or dilatory motive on the part of the

United States District Court
Northern District of California

4

1   movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice

2   to the opposing party by virtue of allowance of the amendment, [and] futility of amendment."

3   *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v.*

4   *Davis*, 371 U.S. 178, 182 (1962)).

5   **EVIDENTIARY OBJECTION**

6       Plaintiff objects to the Declaration of David Freiberg.  Objection, Dkt. No. 17-1; *see*

7   Freiberg Decl., Dkt. No. 14-1.  Civil Local Rule 7-3(a) requires "[a]ny evidentiary and procedural

8   objections to the motion must be contained within the [opposition] brief or memorandum."  As

9   Plaintiff's objections are not contained within his Opposition brief, the Court STRIKES Plaintiff's

10  objection to the Freiberg Declaration.

11  **DISCUSSION**

12  **A.    Breach of Contract**

13      To state a breach of contract claim under California law, a plaintiff must allege "(1) the

14  existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3)

15  defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis W. Realty, LLC v.*

16  *Goldman*, 51 Cal. 4th 811, 821 (2011).

17      Plaintiff alleges Freiberg and Baldwin breached paragraph 4 of the 1985 Agreement with

18  their continued use of the Jefferson Starship name without Chaquico's permission.  FAC ¶ 29.

19  Defendants argue the statute of limitations bars Plaintiff's breach of contract claim.  Mot. at 10-11.

20  Defendants contend Freiberg and Baldwin breached the 1985 Agreement in 2005 and 2008,

21  respectively, when they joined Kantner's Jefferson Starship lineup.  *Id.*  The statute of limitations

22  on Plaintiff's breach of contract claim therefore expired in 2009 and 2012, and the claim is

23  untimely.  *Id.* at 12.

24      Under California law, the statute of limitations for a breach of contract claim is four years.

25  Cal. Civ. Proc. Code § 337(1).  "Ordinarily, a cause of action for breach of contract accrues on the

26  failure of the promisor to do the thing contracted for at the time and in the manner contracted."

27  *Professional Collection Consultants v. Lauron*, 8 Cal. App. 5th 958, 966 (2017), *reh'g denied*

28  (Mar. 13, 2017), *review denied* (Apr. 26, 2017) (internal quotation marks omitted).

1    Plaintiff argues his claims did not accrue until January 2016, when Kantner died. Opp'n at

2    8-9. He contends the 1993 Agreement "makes it explicitly clear that Chacquico had no claim

3    against Freiberg and Baldwin until Kantner died in January 2016." *Id.* at 9. Specifically, the 1993

4    Agreement provides that

> "Chaquico releases his right, if any to sue, demand arbitration or
> make a claim relating to Kantner's past, present or future use of the
> Name [Jefferson Starship] against Kantner, the corporation, the band
> members who signed the March 21, 1985 Agreement [which
> includes Freiberg and Baldwin] and each of their agents, managers,
> attorneys, accountants, directors, officers and employees."

9    *Id.* (quoting 1993 Agreement ¶ 1[2]) (brackets in original; emphasis omitted). As Freiberg and

10   Baldwin were signatories to the 1985 Agreement, Plaintiff argues he could not sue them prior to

11   Kantner's January 2016 death. Opp'n at 9. Defendants argue that while Plaintiff contracted with

12   Kantner not to sue the parties to the 1985 Agreement, Plaintiff did not enter into a similar

13   agreement with Freiberg and Baldwin. Reply at 10. As such, the 1993 Agreement "has no effect

14   on Freiberg's and Baldwin's statutory right to bar untimely legal action on a different contract."

15   *Id.*

16       There are no allegations that Freiberg and Baldwin were parties to the 1993 Agreement;

17   indeed, the 1993 Agreement shows they were not. *See* 1993 Agreement at 9 (bearing signatures of

18   only Plaintiff, Kantner, and their respective counsel). The 1993 Agreement may nevertheless

19   provide Freiberg and Baldwin with benefits. "[F]or a contract to confer rights on a third party, the

20   contracting parties must intend it to do so." *Rodriguez v. Oto*, 212 Cal. App. 4th 1020, 1030

21   (2013). Where, as here, "a contract expressly and unambiguously grants rights to a class including

22   the person now seeking to enforce it, proof of the contract makes out the third party's threshold

23   case" of showing a right to enforcement. *Id.* at 1031; *see id.* at 1030 ("[I]f the requisite intent

24   appears unambiguous from the face of the contract, the third party makes a prima facie showing of

25   _____

26   [2] "Although as a general rule [courts] may not consider any material beyond the pleadings in
     ruling on a Rule 12(b)(6) motion, [courts] may consider extrinsic evidence not attached to the
27   complaint if the document's authenticity is not contested and the plaintiff's complaint necessarily
     relies on it." *Johnson v. Fed. Home Loan Mortg. Corp.*, 793 F.3d 1005, 1007 (9th Cir. 2015).
28   Defendants do not contest the authenticity of the 1993 Agreement. *See* Reply. As such, the Court
     may consider it on this Motion to Dismiss.

United States District Court
Northern District of California

1    entitlement merely by proving the contract.").  The 1993 Agreement specifically provides that

2    Plaintiff "release[d] his right . . . to sue . . . band members who signed the March 21, 1985

3    Memorandum of Agreement[.]"  1993 Agreement ¶ 1.  Taking Plaintiff's allegations as true,

4    Freiberg and Baldwin are signatories to the 1985 Agreement.  *See* FAC ¶¶ 17-18.  They therefore

5    fall within the class of persons whom Plaintiff specifically agreed to release.

6           Further, the 1993 Agreement's release is limited to Plaintiff's "right . . . to sue, demand

7    arbitration or make a claim *relating to Kantner's past, present or future use of the [Jefferson*

8    *Starship] Name* against . . . band members who signed the March 21, 1985 Memorandum of

9    Agreement[.]"  1993 Agreement ¶ 1 (emphasis added).  When Freiberg and Baldwin joined

10   Kantner's Jefferson Starship lineup, their use of the Jefferson Starship name was related to

11   Kantner's use.  *See* FAC ¶ 22 (alleging Freiberg and Baldwin joined *Kantner's* Jefferson Starship

12   lineup).  Their use of the Jefferson Starship did not give rise to any claim by Plaintiff at that point.

13          But Kantner's use of the Jefferson Starship name ceased upon his death in January 2016.

14   Plaintiff alleges that after Kantner's death, Freiberg and Baldwin "continue to perform and sell

15   merchandise using the Jefferson Starship name without [Plaintiff]'s permission to do so and in

16   direct violation of the 1985 Agreement."  FAC ¶ 23.  Freiberg and Baldwin's alleged use of the

17   Jefferson Starship name after Kantner's death is not related to Kantner's use.  Accordingly, the

18   Court DENIES the Motion to Dismiss the breach of contract claim, but only as to breaches that

19   occurred after Kantner died in January 2016.[3]  The Court DISMISSES Plaintiff's breach of

20   contract claim to the extent it relies on breaches that occurred prior to this date.

21   **B.    Lanham Act**

22          While the FAC does not identify the specific provision(s) of section 43(a) that Defendants

23   allegedly violated (*see* FAC), Plaintiff clarifies in his Opposition that this claim is brought

24   pursuant to 15 U.S.C. § 1125(a)(1)(A).  Opp'n at 11.  As is relevant here, this provision creates

25   liability against

26

27   _____

[3] Plaintiff argues that even if his claims accrued in 2005 and 2008 when Freiberg and Baldwin

28   joined Kantner's Jefferson Airplane lineup, each breach of the 1985 Agreement resets the statute of limitations under the continuous accrual doctrine.  Opp'n at 9-10.  The Court need not reach this argument in light of its findings.

United States District Court
Northern District of California

1
2
3
4
5

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

6    15 U.S.C. § 1125(a)(1)(A).  The Ninth Circuit has applied § 43(a) to claims "relating to the use of

7    a public figure's persona, likeness, or other uniquely distinguishing characteristic to cause such

8    confusion."  *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1239 (9th Cir. 2013) (footnote omitted).

9          Plaintiff alleges "Defendants[] use [] [his] likeness to advertise and promote sales of tickets

10   to their live performances, [which] has created the false impression amongst consumers that

11   [Plaintiff] sponsors, endorses and/or is associated in some manner with Defendants and their

12   band."  FAC ¶ 34.  This "also falsely suggests to consumers that [Plaintiff] had agreed to such use

13   of his likenesses in conjunction with Defendants' band."  *Id.*  Consequently, "consumers are likely

14   to be confused that [Plaintiff] sponsors, endorses and/or is associated in some manner with

15   Defendants and their band."  *Id.*

16         Defendants argue Plaintiff cannot assert a Lanham Act claim because he cannot satisfy the

17   test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989).  Mot. at 11-14.  Plaintiff disputes

18   the applicability of *Rogers* to his claim.  Opp'n at 12-15.

19         1.    The *Rogers* Test

20         "Because overextension of Lanham Act restrictions in the area of [artistic expression]

21   might intrude on First Amendment values, [courts] must construe the Act narrowly to avoid such a

22   conflict."  *Rogers*, 875 F.2d at 998.  But while "First Amendment concerns do not insulate . . .

23   artistic works from all Lanham Act claims, such concerns must nonetheless inform [the]

24   consideration of the scope of the Act as applied to claims involving such [works]."  *Id.*  In *Rogers*,

25   actress Ginger Rogers brought a Lanham Act claim against the producers and distributors of a

26   movie titled *Ginger and Fred*, which told the story about two performers who impersonated

27   Rogers and her partner Fred Astair.  *Id.* at 997.  Rogers alleged the defendants "creat[ed] the false

28   impression that the film was about her or that she sponsored, endorsed, or was otherwise involved

8

in the film[.]"  *Id*.  Acknowledging that "[m]ovies, plays, books, and songs are all indisputably works of artistic expression and deserve protection[,]" the Second Circuit also recognized that "[p]oetic license is not without limits.  The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product."  *Id.*  "Consumers of artistic works thus have a dual interest: They have an interest in not being misled and they also have an interest in enjoying the results of the author's freedom of expression."  Balancing these interests, the Second Circuit "construed [the Lanham Act] to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression."  *Id.* at 999.  It further explained that "[i]n the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work."  *Id.*

The Ninth Circuit adopted the *Rogers* test in *Mattel v. MCA Records*, 296 F.3d 894, 901-02 (9th Cir. 2002).  It later expanded *Rogers* "to the use of a trademark in the body of the work." *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008).  More recently, the Ninth Circuit has applied the *Rogers* test to the use of a person's likeness.  *See Brown*, 724 F.3d at 1242 (where the plaintiff alleged the defendant's use of his likeness in video games violated § 43(a) of the Lanham Act, "[t]he only relevant legal framework for balancing the public's right to be free from consumer confusion about [the plaintiff]'s affiliation with [the video game] and [the defendant]'s First Amendment rights in the context of [the] § 43(a) claim is the *Rogers* test.").

As a threshold matter, the work at issue must be an artistic or expressive work in order to trigger the *Rogers* test.  *Brown*, 724 F.3d at 1241 ("The *Rogers* test is reserved for expressive works.").  Plaintiff disputes Defendants' characterization of his Lanham Act claim as one concerning an expressive work; he instead characterizes his claim as one "narrowly based on the blatantly misleading use of his image in advertisements promoting the sale of tickets to Defendants' live performances—a pure proposal for a commercial transaction[.]"  Opp'n at 12. Arguing an advertisement for a commercial transaction is not an artistic or expressive work,

9

1    Plaintiff contends the *Rogers* test is inapplicable.  *Id.* at 13-15.

2         It is true the FAC only challenges Defendants' use of Plaintiff's likeness as it relates to the

3    advertisement and promotion of ticket sales and live performances.  *See, e.g.*, FAC ¶¶ 25, 34, 38.

4    There are no allegations that Defendants' use of Plaintiff's image for other purposes, if any,

5    violates the Lanham Act.  *See generally id.*  Defendants nonetheless maintain the *Rogers* test

6    applies, as "Plaintiff's allegations of advertising [are] ancillary to the promotion of the

7    constitutionally protected form of expression, live musical performances, and [are] also protected

8    under the First Amendment."  Reply at 12.

9         The Ninth Circuit has not determined whether an advertisement promoting an artistic work

10   is itself an expressive or artistic work subject to the *Rogers* test.  But a work need not be either

11   expressive or commercial; rather, it may contain both artistic and commercial elements.  For

12   instance, "[t]itles, like the artistic works they identify, are of a hybrid nature, combining artistic

13   expression and commercial promotion":

14        [t]he title of a movie may be both an integral element of the film-
          maker's expression as well as a significant means of marketing the
15        film to the public.  The artistic and commercial elements of titles are
          inextricably intertwined.  Film-makers and authors frequently rely
16        on word-play, ambiguity, irony, and allusion in titling their works.
          Furthermore, their interest in freedom of artistic expression is shared
17        by their audience.  The subtleties of a title can enrich a reader's or a
          viewer's understanding of a work.
18

19   *Rogers*, 875 F.2d at 998; *see also Mattel*, 296 F.3d at 902 ("A title is designed to catch the eye and

20   to promote the value of the underlying work.  Consumers expect a title to communicate a message

21   about the book or movie, but they do not expect it to identify the publisher or producer.").

22        Similarly, an advertisement for a musical performance is meant to catch the consumer's

23   attention and promote and communicate a message about the band.  For instance, such an

24   advertisement may contain details about how to purchase tickets; it may also provide additional

25   information about the band itself.  An advertisement's design also lends itself to artistic

26   expression, as its "subtleties . . . can enrich a [consumer]'s understanding" of the band.  *Rogers*,

27   875 F.2d at 998.  Because an advertisement may contain expressive elements and based on the

28   present record, the Court finds the *Rogers* test applies.

United States District Court
Northern District of California

a.   *Artistic Relevance*

To satisfy the first prong of the *Rogers* test, Defendants' use of Plaintiff's likeness must have "at least minimal artistic relevance to the work[.]" *Rogers*, 875 F.2d at 999.  This is a "low threshold."  *Id.*  "[T]he level of relevance merely must be above zero[.]" *E.S.S.*, 547 F.3d at 1100.

According to Defendants, the current iteration of Jefferson Starship is "a continuation of the original Jefferson Starship with another lineup."  Reply at 13.  Defendants argue "Plaintiff's likeness is included with other members of Jefferson Starship in historic images and album covers documenting the history of the iconic band."  Mot. at 13.  As such, "Plaintiff's likeness is absolutely relevant to the expressive work of Jefferson Starship and to claim otherwise would be to erase history and place limitations on expressive works."  *Id.*  Plaintiff does not discuss the artistic relevance test in his Opposition.  *See* Opp'n.

The Court cannot find, at this juncture, Plaintiff's likeness possesses "*no* artistic relevance to the underlying work *whatsoever*."  *E.S.S.*, 547 F.3d at 1100 (internal quotation marks omitted; emphasis in original).  Freiberg and Baldwin were members of the original Jefferson Starship, and the current band plays under the same name.  FAC ¶¶ 15, 21-22.  The fact is there is *some* connection between the current and the former Jefferson Starship bands: the current Jefferson Starship was started by Kantner, an original Jefferson Starship member; the bands share the same name; and they share some of the same members.  Defendants' use of Plaintiff's likeness is an attempt to connect the current band to "the rich legacy of the band's music" (*id.* ¶ 24).  Given the low standard and the current Jefferson Starship's ties to the original Jefferson Starship to which Plaintiff belonged, Defendants' use of Plaintiff's image is minimally relevant.

b.   *Public Confusion*

"Even if the use of a trademark or other identifying material is artistically relevant to the expressive work, the creator of the expressive work can be subject to a Lanham Act claim if the creator uses the mark or material to 'explicitly mislead consumers as to the source or the content of the work.'"  *Brown*, 724 F.3d at 1245 (quoting *Rogers*, 875 F.2d at 999) (edits omitted).  "It is key here that the creator must *explicitly* mislead consumers."  *Id.* (emphasis in original).  But a minimal degree of artistic relevance plus "the *slight* risk that such use of a celebrity's [likeness]

1    might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger

2    of restricting artistic expression, and the Lanham Act is not applicable." *Rogers*, 875 F.2d at 1000

3    (emphasis added).

4          Plaintiff asserts "Defendants' use of Chaquico's likeness as alleged . . . falsely suggests to

5    consumers that Chaquico had agreed to such use of his likenesses in conjunction with Defendants'

6    band" and "consumers are likely to be confused that Chaquico sponsors, endorses and/or is

7    associated in some manner with Defendants and their band." FAC ¶ 34.

8          Plaintiff's allegations that Defendants' use of Plaintiffs' likeness in their advertisements

9    creates a false impression are conclusory.  While he alleges Defendants use his likeness in "a

10   blatant attempt to confuse the public by passing off their current band as the original, world-

11   renowned, Jefferson Starship that includes Chaquico" (*id.* ¶ 3), there are no facts to support this

12   assertion.  The FAC is devoid of allegations explaining how the advertisements create the

13   misimpression that Plaintiff sponsors, endorses, or is affiliated with the current Jefferson Starship.

14   For instance, Plaintiff does not describe how Defendants use his image or the context in which it is

15   shown.  As such, there are no facts that explain how Defendants' use of his image explicitly

16   misleads consumers or why Plaintiff believes the public (much less fans who are more likely to be

17   familiar with the history of Jefferson Starship and its multiple iterations) is confused about his

18   relationship with the current band.  Plaintiff therefore fails to set forth facts that Defendants'

19   advertisements create an explicitly misleading description of the current Jefferson Starship.[4]

20

21

22

23   ───────────────

24   [4] Plaintiff argues "[m]ultiple courts have held that allegations of a specific intent to deceive such
     as these are sufficient to defeat the second prong of the *Rogers* test on a motion to dismiss."
     (citing *Elec. Arts, Inc. v. Textron Inc.*, 2012 WL 3042668, at *5 (N.D. Cal. July 25, 2012); *Dita,*
25   *Inc. v. Mendez*, 2010 WL 5140855, at *3 (C.D. Cal. Dec. 14, 2010)).  In *Electronic Arts*, however,
     the counter-defendant also pleaded specific facts about how the at-issue works were similar and
26   therefore misleading. *See id.*, 2012 WL 3042668, at *4-5.  The *Dita* court was also satisfied that
     in addition to pleading intent, the "[c]omplaint allege[d] that [the d]efendant's use of the mark
27   [was] likely to cause consumer confusion." *Dita*, 2010 WL 5140855, at *3.  As explained above,
     the Court finds the FAC lacks sufficient allegations that Defendants' use of Plaintiff's likeness is
     explicitly misleading.  That Plaintiff pleads intent is not, on its own, sufficient to survive the
28   second *Rogers* prong.

United States District Court
Northern District of California

2.    First Amendment

Having found Defendants' advertisements are expressive works which implicate First Amendment concerns, the Court next considers whether Plaintiff's Lanham Act claim is defeated by Defendants' First Amendment rights.  *See* Reply at 11 (arguing the First Amendment protects Defendants' advertisements).  Defendants assert "the Ninth Circuit has held that speech in advertising which is ancillary to the promotion of a constitutionally protected form of expression is also protected by the First Amendment."  *Id.* at 12 (citing *Cher v. Forum Int'l, Ltd.*, 692 F.2d 634, 639 (9th Cir. 1982)).  The *Cher* holding is not as broad as Defendants construe it to be: *Cher* does not automatically confer First Amendment protection onto Defendants' use of Plaintiff's image simply because it is used in an advertisement.  In *Cher*, the plaintiff asserted California state law and Lanham Act claims against magazine publishers for the allegedly unauthorized publication of an interview she gave to a writer.  692 F.2d at 636-39.  In addition to the interview, the defendants "engaged in explicit advertising using [the plaintiff's] name and picture."  *Id.* at 638.  While the plaintiff conceded the publication of the interview was protected by the First Amendment, the court focused on the defendants' use of the plaintiff's likeness in its advertisements.  *Id.* at 638-39.

As an initial matter, the Ninth Circuit "decide[d] [*Cher*] on grounds other than the Lanham Act and therefore express[ed] no opinion on its applicability to these facts."  *Cher*, 692 F.2d at 637 n.1.  In contrast, Plaintiff asserts no state law claims based on Defendants' use of his likeness in their advertisements.  *See* FAC.  Moreover, the *Cher* court held that

> [c]onstitutional protection extends to the *truthful* use of a public figure's name and likeness in advertising which is merely an adjunct of the protected publication and promotes only the protected publication.  [] Advertising to promote a news medium, accordingly, is not actionable under an appropriation of publicity theory *so long as the advertising does not falsely claim that the public figure endorses that news medium.*

*Id.* at 639 (emphasis added).  The Ninth Circuit therefore concluded that the defendants "would have been entitled to use [the plaintiff's] picture and to refer to her truthfully in subscription advertising for the purpose of indicating the content of the publication . . . because such usage is protected by the First Amendment."  *Id.*  That is not what they did: instead, the defendants "w[ere]

13

not content with honest exploitation of the fact that it possessed some pictures of [the plaintiff]" and used them in "patently false" advertisements. *Id.* Specifically, the defendants "falsely proclaimed to the readers of its advertising copy that [the plaintiff] 'tells [the magazine]' things that she 'would never tell [its rival publication]'" when the plaintiff had in fact intended to tell the rival the words in the interview. *Id.* The Ninth Circuit held "[t]his kind of mendacity [was] not protected by the First Amendment, and those defendants responsible for the placement and circulation of the challenged advertising copy must look elsewhere for their protection." *Id.*

Accordingly, the fact that Defendants use Plaintiff's likeness in advertisements does not automatically guarantee them First Amendment protections. If Defendants use Plaintiff's image to falsely advertise that Plaintiff "sponsors, endorses and/or is associated in some manner with Defendants and their band" (FAC ¶ 34) all the while knowing Plaintiff does or is not, such use would not be protected by the First Amendment. *See Cher*, 692 F.2d at 640 ("[T]he trier could find . . . the advertising staff engaged in the kind of knowing falsity that strips away the protection of the First Amendment."). But, as explained above, the FAC offers no details about the advertisements or promotions at issue. There are no facts describing how the advertisements use Plaintiff's likeness, for instance, whether they attribute statements to Plaintiff. In other words, there are insufficient facts that show how the advertisements are patently false. That said, the Court cannot find the First Amendment precludes him from asserting it simply because the claim concerns an advertisement.

       3.   <u>Summary</u>

In sum, Plaintiff's allegations that Defendants' use of his likeness violates the Lanham Act are merely conclusory. The Court therefore DISMISSES his Lanham Act claim. However, as there is nothing to suggest Plaintiff cannot allege the required facts, the Court grants him LEAVE TO AMEND to give him an opportunity to do so.

## CONCLUSION

Based on the foregoing analysis, the Court DENIES Defendants' Motion to Dismiss the breach of contract claim, but only as to breaches that occurred after Kantner died in January 2016. The Court DISMISSES Plaintiff's breach of contract claim to the extent it relies on breaches that

United States District Court
Northern District of California

14

occurred prior to this date.  The Court GRANTS Defendants' Motion to Dismiss Plaintiff's

Lanham Act claim.  Plaintiff shall file an amended complaint no later than September 1, 2017.

  **IT IS SO ORDERED.**


Dated: August 11, 2017

_____

MARIA-ELENA JAMES
United States Magistrate Judge

United States District Court
Northern District of California

15