UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CRAIG CHAQUICO,

    Plaintiff,

v.

DAVID FREIBERG, et al.,

    Defendants.

Case No. 17-cv-02423-MEJ

**ORDER RE: MOTION TO DISMISS AND MOTION TO STRIKE**

Re: Dkt. No. 31

## INTRODUCTION

Defendants David Freiberg, Donny Baldwin, Chris Smith, Jude Gold, and Catherine Richardson move to dismiss one claim asserted in the Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) and to strike one paragraph therein pursuant to Rule 12(f). Mot., Dkt. No. 31; *see* SAC, Dkt. No. 29. Plaintiff Craig Chaquico filed an Opposition (Dkt. No. 32) and Defendants filed a Reply (Dkt. No. 33). The Court previously found this matter suitable for disposition without oral argument. Dkt. No. 34; *see* Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b). Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **DENIES** Defendants' Motion for the following reasons.

## BACKGROUND

In 1970, nonparty Paul Kantner, then a member of the band Jefferson Airplane, invited Plaintiff to join him for a series of recording sessions and concerts, including the first concert performed under the name "Jefferson Starship." SAC ¶ 16. Jefferson Airplane disbanded in 1972, and Jefferson Starship was formed two years later. *Id.* ¶¶ 16-17. The original touring lineup of Jefferson Starship included Kantner, Plaintiff, Freiberg, and four others. *Id.* ¶ 17. Baldwin joined the band in 1982. *Id.* Between 1974 and 1985, Jefferson Starship released twenty platinum and

gold albums. *Id.* ¶ 18. While the Jefferson Starship lineup changed over the years, Plaintiff was the only member to appear on every recording, album, tour, and music video. *Id.*

Kantner left Jefferson Starship in 1984. *Id.* ¶ 19. At the same time, Kantner initiated legal action to prevent the band from continuing to use the Jefferson Starship name. *Id.* In March 1985, Kanter and the remaining members of Jefferson Starship – including Plaintiff, Freiberg, and Baldwin – entered into a settlement agreement (the "1985 Agreement"). *Id.* Paragraph 4 of the 1985 Agreement provided that

> "with respect to the trade name 'Jefferson Starship', (hereinafter referred to as 'The Name'), it is agreed between us that The Name shall be retired effective immediately, with no individual or group, whether or not a party hereto, to be permitted to use The Name, or any designation substantially similar to The Name, in any way, including without limitation, in connection with records, concerts and merchandising…"

*Id.* ¶ 20 (ellipses in original). The 1985 Agreement also provided that Kantner would no longer be a member of the band, but that the remaining members could continue to perform and tour under the name "Starship." *Id.*

Starship released its first album in 1985, though Baldwin did not perform on it. *Id.* ¶ 21. By this time, Freiberg had been fired from the band. *Id.* Baldwin was dismissed from the band in 1989 after assaulting another band member. *Id.* ¶ 22. Plaintiff left Starship in 1990. *Id.*

After Plaintiff's departure, Kantner began touring with various musicians under the name "Jefferson Starship," despite the 1985 Agreement's prohibition of such use. *Id.* ¶ 23. Plaintiff took legal action against Kantner for Kantner's unauthorized use of the Jefferson Starship name. *Id.* In 1993, Plaintiff and Kantner reached a settlement agreement (the "1993 Agreement"), in which Plaintiff gave Kantner permission to use the Jefferson Starship name in connection with live performances and merchandise. *Id.* Plaintiff "is informed and believes . . . Kantner . . . received permission from at least some of the other signatories to the 1985 Agreement for him to use the Jefferson Starship name and that any signatories to the 1985 Agreement that did not provide permission to Kantner to use the name did not object to his use." *Id.*

Smith joined Kantner's Jefferson Starship band in 1998, and Freiberg joined in 2005. *Id.* ¶ 24. Baldwin and Richardson joined Kantner's Jefferson Starship in 2008; Gold joined in 2012.

2

*Id.* From the time Defendants joined Kantner's Jefferson Starship until Kantner's death in January 2016, that band continued to use the name pursuant to the permission Plaintiff gave to Kantner. *Id.*

Since Kantner's death, however, Defendants have continued to perform and sell merchandise using the Jefferson Starship name. *Id.* ¶ 25. Plaintiff has repeatedly informed Freiberg and Baldwin that they do not have his permission to perform as Jefferson Starship or to sell merchandise under that name. *Id.* ¶ 26. Plaintiff objects to Defendants' continued use of the Jefferson Starship name because the current band's connection to the original band is too attenuated to preserve the rich legacy of the band's music, as seven out of the eight members of the original Jefferson Starship are not part of the band's current iteration. *Id.* Plaintiff further takes issue with Freiberg's and Baldwin's participation in the current Jefferson Starship because, in light of their "ignominious dismissals[,] . . . it is an affront to the legacy of both bands" for Freiberg and Baldwin to perform under the Jefferson Starship name. *Id.*

In addition, Defendants have used images of the first Jefferson Starship iteration, including images of Plaintiff, in posters and advertisements to promote the sale of tickets to their live performances. *Id.* ¶ 27. Defendants have done so without Plaintiff's permission. *Id.* By using Plaintiff's likeness, Defendants have misled consumers into believing Plaintiff performs with the current Jefferson Starship and/or that Plaintiff sponsors, endorses, or is otherwise associated with the band. *Id.* In particular, Defendants' advertisement for a "Jefferson Starship 40th Anniversary Tour" contains an image of the original band, "a clear, explicit and misleading statement that [Plaintiff] and others would be performing at such live performances." *Id.* ¶ 28. In fact, Plaintiff has never performed with the current Jefferson Starship, is not associated with it, and does not otherwise sponsor or endorse it. *Id.* ¶ 27.

Plaintiff repeatedly demanded Defendants cease and desist using the Jefferson Starship name in any manner. *Id.* ¶ 26. Defendants refused to do so, on the ground they have permission from the other living signatories to the 1985 Agreement to use the name. *Id.* ¶ 29. Defendants' unauthorized use of the Jefferson Starship name has negatively impacted Plaintiff's ability to secure agreements and/or obtain full value for Plaintiff's own performances. *Id.*

3

Plaintiff initiated this action on April 27, 2017. *See* Compl., Dkt. No. 1. Plaintiff's First Amended Complaint ("FAC") asserted two claims: (1) breach of contract against Freiberg and Baldwin, and (2) violation of the Lanham Act, 15 U.S.C. § 1125(a) against all Defendants. FAC ¶¶ 27-39, Dkt. No. 11. On August 11, 2017, the Court granted in part and denied in part Defendants' Motion to Dismiss the FAC. Order re: Mot. to Dismiss ("MTD Order"), Dkt. No. 25. The Court denied the Motion insofar as it pertained to breaches that occurred after Kantner's death in January 2016, and granted the Motion with leave to amend as to Plaintiff's Lanham Act claim. *See id.*

Plaintiff timely filed the SAC. Defendants filed the instant Motion, in which they seek to dismiss only Plaintiff's Lanham Act claim and strike paragraph 14 of the SAC. *See* Mot.

## MOTION TO DISMISS

### A. Legal Standard

Rule 8(a) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).

A court may dismiss a complaint under Rule 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as

true and construe them in the light most favorable to the plaintiff. *Id.*; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007). In addition, courts may consider documents attached to the complaint. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted).

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citations omitted). However, the Court may deny leave to amend for a number of reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

**B.     Discussion[1]**

Section 43(a)(1) of the Lanham Act provides that

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial

---

[1] In support of their Motion, Defendants submit the Declaration of David Freiberg. *See* Freiberg Decl., Dkt. No. 31-1. In ruling on a motion to dismiss, courts should not consider evidence outside of the complaint. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001). "The general prohibition against looking at matters beyond the complaint to resolve a Rule 12(b)(6) motion ensures that parties have adequate notice to present additional evidence and establish whether there are any genuine issues of material fact to be resolved." *de Fontbrune v. Wofsy*, 838 F.3d 992, 999 (9th Cir. 2016), *as amended on denial of reh'g and reh'g en banc* (Nov. 14, 2016). The Court therefore declines to consider the Freiberg Declaration at this time.

5

<blockquote>
activities shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
</blockquote>

15 U.S.C. § 1125(a)(1)(A). The Ninth Circuit and others have applied § 43(a) to claims "relating to the use of a public figure's persona, likeness, or other uniquely distinguishing characteristic to cause such confusion." *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1239 (9th Cir. 2013) (footnote omitted); *see Parks v. LaFace Records*, 329 F.3d 437, 445 (6th Cir. 2003) ("[T]he scope of § 43(a) extends beyond disputes between producers of commercial products and their competitors. It also permits celebrities to vindicate property rights in their identities against allegedly misleading commercial use by others." (collecting cases)).

### 1. Applicability of *Rogers*

Defendants argue the test set forth in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), applies to Plaintiff's Lanham Act claim. Applying the test, Defendants argue the advertisements are expressive works entitled to First Amendment protections and do not explicitly mislead the public such that Plaintiff's Lanham Act claim is subject to dismissal.

The Court earlier dismissed Plaintiff's Lanham Act claim because Plaintiff failed to allege facts "explaining how the advertisements create the misimpression that Plaintiff sponsors, endorses, or is affiliated with the current Jefferson Starship. For instance, Plaintiff d[id] not describe how Defendants use his image or the context in which it is shown." MTD Order at 12. Without such facts, the FAC did not "explain how Defendants' use of his image explicitly misle[d] consumers or why Plaintiff believe[d] the public (much less fans who are more likely to be familiar with the history of Jefferson Starship and its multiple iterations) [was] confused about his relationship with the current band." *Id.* The SAC now provides three images which Plaintiff alleges are "[e]xamples of Defendants' unauthorized use of Chaquico's image to promote the sale of tickets to their live performances[.]" SAC ¶ 27. Given these newly alleged facts, the Court revisits the question of whether the advertisements are expressive works which trigger the *Rogers* test. *See Brown*, 724 F.3d at 1241 ("The *Rogers* test is reserved for expressive works.").

Defendants argue that "[c]ourts have long held that musical and artistic works are expressive and protected by the First Amendment." Mot. at 11 (collecting cases). But Plaintiff's

Lanham Act claim is not based on Defendants' performances; rather, it is based on Defendants' advertisements for those performances.[2] Plaintiff characterizes his Lanham Act claim as one "narrowly based on the blatantly misleading use of his image in advertisements promoting the sale of tickets to Defendants' live performances – a pure proposal for a commercial transaction which does not fall within the *Rogers* test." Opp'n at 3. Plaintiff thus urges the Court to abandon the *Rogers* test, as "the Court now has before it examples of the types of advertisements at issue and can see for itself that they contain no such expressive elements." *Id.* at 4; *see* SAC ¶ 27 (providing photographic examples of Defendants' allegedly unauthorized use of Plaintiff's image). Plaintiff argues "[t]he advertisements merely contain the most basic information about the product being sold, here tickets to concerts, including the name of the band and the date and location of the performance." *Id.* Plaintiff describes the advertisements as "containing an additional, explicitly misleading element: images of the original Jefferson Starship lineup, including images of Chaquico." *Id.*

Commercial speech is not afforded the same First Amendment protections as expressive, non-commercial conduct. *See Charles v. City of L.A.*, 697 F.3d 1146, 1151 (9th Cir. 2012) ("'Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression.'" (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995)). Therefore, while "Section 43(a) protects the public's interest in being free from consumer confusion about affiliations and endorsements, . . . this protection is limited by the First Amendment, particularly if the product involved is an expressive work." *Brown*, 724 F.3d at 1239.

---

[2] For this reason, Defendants' reliance on *Cinevision Corp. v. Burbank*, 745 F.2d 560, 569 (9th Cir. 1984), is misplaced. *See* Mot. at 11-12. *Cinevision* concerned a music promoter's ability to promote concerts in a municipality-owned theatre. 745 F.2d at 565. Finding the municipality's rejection of certain types of concerts violated the promoter's First Amendment rights, the Ninth Circuit held that "live musical expression is protected by the first amendment. [It] also h[e]ld that [the promoter] enjoyed a first amendment right to promote concerts." *Id.* at 569. Plaintiff does not challenge Defendants' right to perform Jefferson Starship songs, only their advertisements. *See* SAC. Plaintiff does so only to the extent Defendants use his image; he does not allege Defendants have no right whatsoever to promote their concerts. *Cinevision* is inapposite.

7

"[C]ommercial speech [is] defined as 'expression related solely to the economic interests of the speaker and its audience[.]'" *Am. Beverage Ass'n v. City & Cty. of S.F.*, __ F.3d__, 2017 WL 4126944, at *3 (9th Cir. Sept. 19, 2017) (quoting C*entral Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980)); *see Hoffman*, 255 F.3d at 1184 ("[T]he 'core notion of commercial speech' is that it 'does no more than propose a commercial transaction.'" (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). In other words, "[t]he question . . . boils down to whether [Defendants'] use of [Plaintiff's likeness] was 'in connection with a sale of goods or services.' If it [is] not, then [the] use [is] 'noncommercial' and d[oes] not violate the Lanham Act." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005). "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation." *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 463 U.S. at 66-67).

Upon inspection, the first and third images Plaintiff includes in the SAC do not contain information about ticket sales. The first image contains the title "Jefferson Starship – 10th Anniversary Tour" and states, directly below the word "Borderline", "Tuesday 21 January 2014." The third image provides the time, date, and location of a Jefferson Starship performance. Both images contain a photograph of what appears to be a lineup of the first Jefferson Starship iteration, including Plaintiff. Neither image provides information about how to purchase tickets or ticket pricing; indeed, the word "ticket" does not appear in either image. The second image mentions the sale of tickets: it lists a website after stating "Tickets Online" and contains a notation of "$40+" in the upper left hand corner. This image also contains four photographs, one of which depicts Plaintiff; names the performer as "Jefferson Starship" and states it is performing "one night only"; and provides the time, date, and location of the performance.

That the first and third images do not contain information about ticket sales is not fatal to Plaintiff's argument that they constitute "a pure proposal for a commercial transaction which does not fall within the *Rogers* test." Opp'n at 3. The Ninth Circuit has held that a proposed billboard advertisement for a television program constituted commercial speech where the advertisement

8

"consist[ed] only of photographs of the program's hosts and the name of the program; no other message [was] conveyed." *See Charles*, 697 F.3d at 1152; *see id.*, App'x A (image of proposed billboard). The *Charles* court analyzed the First Amendment and regulation of speech and not the Lanham Act, but its analysis is nevertheless informative. The Ninth Circuit recognized that "[c]ertain advertisements for noncommercial works might include both an invitation to participate in a commercial transaction as well as some amount of noncommercial expression entitled to heightened First Amendment protection." *Id.* at 1152. But the court concluded that the "billboard [did] not present intertwined [commercial and noncommercial] speech." *Id.* "That the underlying . . . program [was] itself entitled to full First Amendment protection [did] not cloak all advertisements for the program with noncommercial status; speech inviting the public to watch [the program] is not inherently identical to the speech that constitutes the program itself." *Id.*

Defendants argue Plaintiff mistakenly relies on *Hoffman*, 255 F.3d. Reply at 7; *see* Opp'n at 3 ("'Commercial messages, however, do not receive the same level of constitutional protection as other types of protected expression.'" (quoting *Hoffman*, 255 F.3d at 1184)). Defendants contend *Hoffman* in fact supports their "claim of First Amendment protection" as "the Ninth Circuit held that advertisements, or commercial speech, are entitled to First Amendment protection." Reply at 7 (citing *Hoffman*, 225 F.3d at 1184).

Defendants' contention stretches both the facts and holding of *Hoffman*. First, the Ninth Circuit recognized that while commercial speech "is entitled to a measure of First Amendment protection[,]" such "messages . . . do not receive the same level of constitutional protection as other types of protected expression." *Id.* at 1184. Second, *Hoffman* concerned a magazine article that was not printed for the purpose of selling any product or service. The article "entitled 'Grand Illusions' . . . used computer technology to alter famous film stills to make it appear that the actors were wearing Spring 1997 fashions." *Id.* at 1183. The article included a film still from the movie *Tootsie* that bore an unauthorized, altered image of actor Dustin Hoffman. *Id.* Hoffman sued the magazine's publisher and asserted a Lanham Act claim, among others. *Id.*

The Ninth Circuit held the "publication of the altered 'Tootsie' photograph was not commercial speech." *Id.* at 1186; *see id.* at 1189 ("We conclude that [the defendant] is entitled to

9

the full First Amendment protection awarded noncommercial speech."). The court distinguished the article from a commercial advertisement:

> [The magazine] did not use Hoffman's image in a traditional advertisement printed merely for the purpose of selling a particular product. Insofar as the record shows, [the magazine] did not receive any consideration from the designers for featuring their clothing in the fashion article containing the altered movie stills.

*Id.* At most, the court held the article contained both commercial and expressive elements:

> Nor did the article simply advance a commercial message. "Grand Illusions" appear[ed] as a feature article on the cover of the magazine and in the table of contents. It [was] a complement to and a part of the issue's focus on Hollywood past and present. Viewed in context, the article as a whole [was] a combination of fashion photography, humor, and visual and verbal editorial comment on classic films and famous actors. Any commercial aspects [were] inextricably entwined with expressive elements, and so they [could] []not be separated out from the fully protected whole.

*Id.* (internal quotation marks omitted). As such, "common sense [told the court] this [was] not a simple advertisement." *Id.*

The SAC does not allege Plaintiff's likeness appears in a context similar to the article at issue in *Hoffman*, such that commercial aspects are inextricably entwined with expressive elements, causing the advertisements lose their purely commercial character. *See Hunt*, 638 F.3d at 715 ("Commercial speech does not retain its commercial character 'when it is inextricably intertwined with otherwise fully protected speech.'" (quoting *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988))); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 906 (9th Cir. 2002) ("If speech is not 'purely commercial'—that is, if it does more than propose a commercial transaction—then it is entitled to full First Amendment protection."). On the contrary, the SAC alleges Defendants use Plaintiff's image "to advertise and promote the sale of tickets to their live performances in concert posters and in advertisements for their live performances without Chaquico's permission." SAC ¶ 27; *see id.* ¶ 37 ("Defendants' use of Chaquico's likeness to advertise and promote sales of tickets to their live performances. . . ."). There are no allegations that Defendants use it for any other purpose, let alone an expressive one.[3]

---

[3] Defendants also rely on *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118 (N.D. Cal. 2002). *See* Mot. at 12; Reply at 7-8. The plaintiff in *Daly* asserted a claim under California Civil Code section

10

The SAC alleges facts showing that Defendants use the advertisements containing Plaintiff's image in connection with a sale of goods or services, namely, ticket sales and/or musical entertainment services. Nothing in the SAC allows the Court to find at this point that the advertisements are anything but commercial messages. As alleged, the advertisements show nothing more than a commercial transaction promoting the current Jefferson Starship, i.e., they promote the sale of tickets for Defendants' performances or attendance thereto.

The Court therefore cannot find at this juncture that the advertisements are noncommercial and thus avoid being subject to a Lanham Act claim. In sum, the SAC does not allege that Defendants use Plaintiff's likeness in anything other than a purely commercial context. Defendants have not, at this early stage, offered any arguments that suggest the advertisements in question appeared in an expressive work. The *Rogers* test is reserved for expressive works. Based on the current record, the Court finds the SAC alleges Defendants' advertisements are not expressive, and that the *Rogers* test does not apply.

---

3344. 238 F. Supp. 2d at 1122; *see* Cal. Civ. Code § 3344 (prohibiting the "use[] [of] another's name, voice, signature, photograph, or likeness . . . for purposes of advertising or selling, or soliciting purchases of, products, merchandise, goods or services, without such person's prior consent[.]"). The *Daly* plaintiff appeared in a television program, parts of which the defendant used in the program's advertisement campaign. *Daly*, 238 F. Supp. 2d at 1123-24 (describing plaintiff's appearances in film and advertisements). The *Daly* plaintiff's appearance in the television program eliminated the possibility of confusion about the nature of the program. In other words, it was not misleading to use the plaintiff's image in the program's advertisements when she appeared in the show. That is not the case here. Defendants argue "Plaintiff performed recordings of musical compositions that Jefferson Starship still performs" and "boasts of his association with the underlying artistic work of Jefferson Starship." Reply at 7-8 (citing SAC ¶¶ 17-19). Plaintiff alleges he is not part of the current Jefferson Starship band and does not perform with them. *See* SAC ¶ 38 ("Chaquico does not perform with, endorse, sponsor, and is not associated with Defendants or their band."). It is the very fact that Plaintiff does *not* perform with the current band that gives rise to his Lanham Act claim: although he is not affiliated with Defendants, their advertisements may lead the public to believe he is. *See id.* ¶ 37 ("As a result of Defendants' conduct, consumers are likely to be confused into believing that Chaquico performs with, sponsors, endorses and/or is associated in some manner with Defendants and their band.").

Moreover, *Daly* was decided pre-*Charles*. The *Daly* court found that because the television program was "an expressive work protected by the First Amendment, [the] plaintiff c[ould ]not state a misappropriation claim based on the use of her likeness in the program or the advertisements for the program." 238 F. Supp. 2d at 1123. But it did so without the benefit of the Ninth Circuit's holding that the First Amendment protections afforded to an underlying expressive program "do[] not cloak all advertisements for the program with noncommercial status[.]" *Charles*, 697 F.3d at 1152.

### 3. Conduct Attributable to Defendants

Defendants also argue Plaintiff fails to allege facts that Defendants created or controlled the images in the SAC. Mot. at 15; *see id.* ("Plaintiff . . . blindly plants three images without any factual support as to who created or controlled the creation of these images."). Plaintiff contends he need not allege who created or controlled his images, as it is sufficient that he alleges Defendants "use" them. Opp'n at 10. Plaintiff asserts the SAC "clearly allege[s] that Defendants[] 'used' the images to promote ticket sales to their live performances." *Id.* (citing SAC ¶¶ 4, 27, 37).

Section 43(a) only requires a "use." *See* 15 U.S.C. § 1125(a). Defendants cite no authority interpreting "use" to mean "create" or "control." The lack of allegations that Defendants created or controlled advertisements displaying Plaintiff's image is not a ground for dismissal. Plaintiff alleges Defendants use his image in advertisements, and he offers examples of those advertisements in support of those allegations. *See* SAC ¶ 27. For purposes of a Rule 12(b)(6) motion, that is sufficient.

### C. Summary

The SAC alleges sufficient facts showing how Defendants use Plaintiff's likeness in their advertisements. There are also no allegations that Defendants' advertisements are anything but commercial speech subject to a Lanham Act claim. Put another way, there is nothing in the SAC to allow the Court to conclude that Defendants use Plaintiff's likeness in an expressive work or in a work where the commercial and noncommercial elements are inextricably intertwined. As such, the Court finds Plaintiff has stated a Lanham Act claim and **DENIES** the Motion to Dismiss.

## MOTION TO STRIKE

### A. Legal Standard

Federal Rule of Civil Procedure 12(f) allows a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Immaterial matters are "those which ha[ve] no essential or important relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994) (internal quotation marks omitted). Impertinent matters "do

not pertain, and are not necessary, to the issues in question." *Id.* (internal quotation marks omitted).

The purpose of a Rule 12(f) motion "is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial[.]" *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (internal quotation marks omitted). "Motions to strike are generally disfavored and 'should not be granted unless the matter to be stricken clearly could have no possible bearing on the subject of the litigation.'" *Luxul Tech. Inc. v. NectarLux, LLC*, 2015 WL 4692571, at *3 (N.D. Cal. Aug. 6, 2015) (quoting *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004)). The decision to grant a motion to strike ultimately lies within the discretion of the trial court. *Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 271-72 (N.D. Cal. 2015) (citing *Whittlestone*, 618 F.3d at 973); *see Whittlestone*, 618 F.3d at 973 ("We review the district court's decision to strike matter pursuant to Federal Rule of Civil Procedure 12(f) for abuse of discretion." (internal quotation marks omitted)).

**B.     Discussion**

Defendants move to strike paragraph 14 of the SAC, which alleges

> Jurisdiction alternatively exists in this action pursuant to 28 U.S.C. § 1332, based on the complete diversity of citizenship between Chaquico and Defendants. The amount at issue exceeds $75,000 in that the value of the use of the Jefferson Starship name to Defendants exceeds that amount, and the value to Chaquico in Defendants ceasing their unauthorized use of the Jefferson Starship name exceeds that amount.

Defendants do not argue paragraph 14 contains any redundant, immaterial, impertinent, or scandalous matters. Defendants instead argue Plaintiff improperly amended his jurisdictional allegations, as the Court granted leave to amend only so that Plaintiff could allege additional facts in support of his Lanham Act. Mot. at 17-18 (citing MTD Order at 14).

"[W]here leave to amend is given to cure deficiencies in certain specified claims, courts have agreed that new claims alleged for the first time in the amended pleading should be dismissed or stricken." *DeLeon v. Wells Fargo Bank, N.A.*, 2010 WL 4285006, at *3 (N.D. Cal. Oct. 22, 2010) (collecting cases). But paragraph 14 does not add a new claim or theory of liability, only an additional basis for jurisdiction.

13

1. Moreover, "[i]n actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.'" *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 840 (9th Cir. 2002) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)). Defendants emphasize that "Plaintiff seeks no monetary damages for his breach of contract claim[,]" only injunctive relief. Mot. at 18; *see* Prayer for Relief, SAC. Assuming, *arguendo*, Defendants are correct that "[t]he object of the litigation here is the breach of contract claim regarding the restrictive covenant contained within the 1985 Agreement" (Reply at 11), nothing in the record indicates Plaintiff does not value his breach of contract claim in an amount greater than $75,000. The Court therefore cannot conclude paragraph 14 clearly has no possible bearing on the subject of the litigation.

Accordingly, the Court **DENIES** the Motion to Strike.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion to Dismiss and to Strike. Defendants shall answer the SAC no later than November 14, 2017. In addition, the Court shall conduct a Case Management Conference on December 14, 2017 at 10:00 a.m. in Courtroom B, 15th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102. This conference shall be attended by lead trial counsel. No later than seven calendar days before the Case Management Conference, the parties shall file a Joint Case Management Statement containing the information in the Standing Order for All Judges in the Northern District of California, available at: http://cand.uscourts.gov/mejorders. The Joint Case Management Statement form may be obtained at: http://cand.uscourts.gov/civilforms. If the statement is e-filed, no chambers copy is required.

**IT IS SO ORDERED.**

Dated: October 24, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge